# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

STEPHEN C. LILLY,

        Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

No. 19-CV-4065-CJW

**REPORT AND RECOMMENDATION**

_____

Plaintiff Stephen C. Lilly ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.     BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 10) and only summarize the pertinent facts here. Claimant was born on April 17, 1969. (AR[1] at 142.) Claimant has at least a high school education and is able to communicate in English. (*Id.* at 21.) He allegedly became disabled due to PTSD and migraines. (*Id.* at 170.) Claimant's onset of disability date was June 1, 2002. (*Id.* at 142.) Claimant filed his

---

[1] "AR" cites refer to pages in the Administrative Record.

application for DIB on November 2, 2017. (*Id.* at 10.) His claim was denied originally and on reconsideration. (*Id.* at 74-78, 80-83.) A video hearing was held on November 1, 2018 with Claimant and his attorney, Steve Hamilton, in Spencer, Iowa; ALJ William L. Hogan in Fargo, North Dakota; and vocational expert ("VE") Thomas Audet appearing by phone. (*Id.* at 34-58.) Claimant and the VE testified. (*Id.* at 38-57.) The ALJ issued an unfavorable decision on January 16, 2019. (*Id.* at 10-22.)

Claimant requested review and the Appeals Council denied review on July 31, 2019. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On August 7, 2019, Claimant timely filed his complaint in this Court. (Doc. 3.) On April 27, 2020, all briefing was completed and the Honorable C.J. Williams referred the case to me for a Report and Recommendation.

## II. *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

2

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is

presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

As a threshold issue, the ALJ determined that Claimant last met the insured status requirements of the Social Security Act on December 31, 2007. (AR at 12.) The ALJ then made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from his alleged onset of disability date of June 1, 2002 through his last date insured ("LDI") of December 31, 2007. (*Id.*)

4

At step two, the ALJ found that Claimant suffered from the following severe impairments: migraines, degenerative disc disease, post-traumatic stress disorder ("PTSD"), and mood disorder. (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.* at 13.)

The ALJ evaluated Claimant's claims under Listings 1.02A and 1.02B (major disfunction of a joint due to any cause); 1.04A (disorders of the spine with evidence of nerve root compression); 12.04 (depressive, bipolar and related disorders); and 12.15 (trauma- and stressor-related disorders). (*Id.* at 13-14.)

At step four, the ALJ found that Claimant had the following RFC:

[T]hrough the date last insured, the claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) except: the claimant was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. The claimant was limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant was limited to standing or walking (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant was limited to never climbing ladders, scaffolds or ropes. The claimant was limited to occasional climbing of ramps or stairs. The claimant was limited to avoiding concentrated exposure to work hazards. Mentally, the claimant was limited to occasional interaction with supervisors, brief and superficial contact with supervisors and no interaction with the general public.

(*Id.* at 14.) The ALJ further found Claimant was unable to perform any of his past relevant work. (*Id.* at 20.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform, including small products assembler, production assembler, and laundry folder. (*Id.* at 21.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.* at 22.)

5

**B.     The Substantial Evidence Standard**

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).  A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).  The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.     DISCUSSION

Claimant alleges the ALJ committed reversible error by failing to fully develop the record concerning his migraines.  Claimant further argues that his case must be

remanded because the ALJ was not appointed in a constitutional manner. Thus, he argues the ALJ's decision must be vacated and his case remanded so a properly-appointed ALJ may adjudicate the claim.

**A.** ***Whether the ALJ Fully Developed the Record Concerning Claimant's Migraines***

    **1.** ***Relevant Evidence***

        **a.** ***Treatment History***

Claimant has a long history of migraines that he testified began in January 1991 during his military service in the Middle East. (AR at 40.) Claimant also has a long history of seeking relief for those migraines. (*Id.* at 15-16.) The ALJ began his discussion of Claimant's migraine history in the following way:

> The claimant stated he had not worked since the alleged disability onset date due to migraines and difficulties with PTSD. The claimant stated he was a service connected veteran but indicated that the Veterans Administration (VA) had not given him service connection for migraines due to lack of documentation. The claimant stated that he had been having chronic migraine since his time in service in the early 1990s. He stated they had not gotten better despite multiple treatment modalities and indicated the migraines could last for days at a time. When having a migraine, he stated that he was unable to function. However, he also reported that he had worked at Tyson Foods for many years with the same impairment until he stated he was terminated from that job due to migraine. As of the date last insured in 2007, the claimant complained of having migraines multiple times per week.

(*Id.* at 15.)

In August 2002, Claimant told his neurologist that he had been doing well with his headaches until he had some recent personal problems. (*Id.* at 477.) At this time, he complained of incapacitating headaches. (AR at 478.) Claimant had recently injured his hand at work, "was written up, counseled, and in essence, forced to leave." (*Id.*) This was causing financial and family stress. (*Id.*) In pertinent part, Claimant was diagnosed

with chronic daily headache with mild exacerbations.  (*Id.*)  In October 2002, Claimant was collecting unemployment benefits and applying for work.  (*Id.* at 468.)

In February 2003,[2] Claimant followed up with his neurologist and said that his headaches were under good control on amitriptyline and ibuprofen.  (*Id.* at 466.)  In April 2003, Claimant was submitting two job applications per week.  (*Id.* at 460.)  A May 2003 head CT showed no evident abnormalities.  (*Id.* at 457-58.)  In May 2004, Claimant  had improved control of daily chronic headaches with amitriptyline, ibuprofen, and hydrocodone.  (*Id.* at 432.)    In August 2003, Claimant was enjoying being a "househusband" and taking care of his children.  (*Id.* at 448.)  He reported that he built a fence around the yard and a swing set.  (*Id.*)  In October 2003, Claimant reported that in the past three weeks his headaches "got a little bit worse."  (*Id.* at 444.)  Claimant was taking ibuprofen and amitriptyline for relief.   (*Id.*)  Claimant "continued to be the househusband taking care of the children while his wife work[ed] part-time.  The children [were] 13, 12, 6, and 2."  (*Id.*)  By May 2004, Claimant was "doing much better" with his pain, and did not normally need to take hydrocodone during the day if he took it at bedtime.  (*Id.* at 432.)  Claimant continued to take care of his children, "which he said is quite helpful to him."  (*Id.*)  In October 2004, Claimant's headaches were under "great control."  (*Id.* at 419.)  In February 2005, Claimant complained of increased headaches during the previous month and a half.  (*Id.* at 399.)  Claimant had been having difficulty getting his medication, but stated the headaches began before those difficulties.  (*Id.*)

In September 2005, Claimant was having daily headaches that were under "poor control" and was "rather photophobic."  (*Id.* at 370.)  In January 2006, the claimant reported that he had headaches all the time but they were not as bad as they had been.

---

[2] The ALJ states this was March 2003.  (AR at 15.)  However, the treatment note states that the date of the note was February 14, 2003 and the date of entry was March 6, 2003.  (*Id.*)

(*Id.* at 353.)  In spite of this, Claimant continued to care for his children from 8:00 a.m. to 6:00 p.m. while his ex-wife worked and he went hunting "about every night." (*Id.*) Claimant was tapered off Topamax and started on Baclofen. (*Id.*)  In April 2006, Claimant was doing well with headache control and did not want to change medications. (*Id.* at 345-46.)  Claimant was taking prochlorperazine, amitriptyline, and hydrocodone for his headaches. (*Id.* at 346.)  Claimant had a "better outlook on his life situation" because he was dating a new woman, which was "much easier on his headaches." (*Id.*) However, by September 2006, Claimant reported that his headaches had been worse, but that he had been under tension and stress with both his ex-wife and his girlfriend. (*Id.* at 325.)  Claimant's headache pain was under "only moderate control." (*Id.*)  In October 2006, Claimant reported only a "slight headache" with a pain rating of 2 out of 10. (*Id.* at 315.)

In June 2007, Claimant reported an increase in headache symptoms during the previous couple of months. (*Id.* at 300.)  Claimant reported that the headaches were of the same type as before, but were more severe and more frequent. (*Id.*)  Claimant had been taking more hydrocodone because of this increase in pain. (*Id.*)  In September 2007, Claimant was referred for Botox injections. (*Id.* at 289.)  On September 25, 2007, neurologist Lynn M. Rankin noted that Claimant had tried Topamax, Depakote, Baclofen, anti-inflammatories, muscle relaxers, and Tizanidine for headache relief. (*Id.*) Dr. Rankin stated that Claimant described his normal headaches as a dull ache over the right crown of his head that he rated as 3 or 3.5 out of 10 on a 10-point pain scale. (*Id.*) Dr. Rankin also noted that Claimant "does not have photophobia or phonophobia except with the severe attacks; in which case, he has some phonophobia." (*Id.*)  Claimant estimated that he had a bad headache requiring him to go to bed about once a week. (*Id.*) Dr. Rankin also noted that Claimant never had nausea or vomiting with his headaches, but did have acid reflux. (*Id.*)  Dr. Rankin diagnosed Claimant with chronic daily

9

headache, mixed tension-type, and migraine without aura, with an added component of rebound headache secondary to the use of hydrocodone.[3] (*Id.* at 291.)

Claimant received Botox injections in October 2007. (*Id.* at 288.) In November 2007, Claimant reported that he did "much better" for the first ten days after the Botox injections, going an entire week without a headache. (*Id.* at 284.) However, Claimant was now averaging between three and six headaches per week. (*Id.*) His pain that day was 5/10 and Claimant was wearing sunglasses because he was photophobic. (*Id.*) Claimant was taking hydrocodone for bad migraines, but was able to stay within a two-day-per-week limit. (*Id.*) Dr. Rankin scheduled Claimant for additional Botox injections with increased dosages in January 2008. (*Id.* at 285.)

### b.    *Relevant Testimony*

Claimant testified that his headaches have become more severe since their first occurrence. (AR at 42-43.) He also testified that in 2007, his headaches were so bad that he had to lay down and stay away from physical activity multiple days-per-week. (*Id.* at 45.) Claimant testified that he would have been unable to work at his old job at the Tyson meat packing plant due to his migraines. (*Id.* at 46.) He stated that he thought he would have been absent from work due to headaches more than four days per month if he had to work in 2007. (*Id.* at 47.) Claimant testified that his migraines could last "upwards of several days" in 2007. (*Id.* at 49.) Claimant also testified that the Veterans Administration ("VA") had determined that his migraines were not a service-connected disability due to a lack of documentation. (*Id.* at 39.)

---

[3] "Medication overuse headaches or rebound headaches are caused by regular, long-term use of medication to treat headaches, such as migraines." Mayo Clinic, *Medication overuse headaches*, https://www.mayoclinic.org/diseases-conditions/medication-overuse-headache/symptoms-causes/syc-20377083.

### c.  *Opinion Evidence*

The ALJ noted that Claimant had several VA compensation and pension examinations during the relevant time period, and that neither PTSD nor migraines were found to prevent Claimant from being employable. (*Id.* at 18 (citing AR at 321-24, 333).) Claimant's 2006 compensation and pension examination concluded that "it was at least as likely as not" that Claimant's headaches would not prevent him from gaining or sustaining employment. (*Id.* at 333.)  Claimant's November 2007 compensation and pension examination concluded, "At this point, the veteran would appear to be someone who, due to posttraumatic stress disorder signs and symptoms would show reduced reliability and productivity.  He would have more difficulty than the average person, as for example, in getting and holding employment, because of his relationship skills, his extreme aversion to being or working around other people, and his somewhat inappropriate presentation." (*Id.* at 283.)  The ALJ found Michael McNeil, Ph.D., the author of the examination statements, to be an acceptable medical source. (AR at 19.)  However, the ALJ found these statements "unpersuasive in comparison to the longitudinal record from the alleged onset of disability date to the date last insured showing fairly good control of both migraines and PTSD symptoms in relation to the claimant's strong activities of daily living. . . ." (*Id.*)

The state agency medical consultants reviewed Claimant's record and determined there was insufficient evidence for them to fully evaluate Claimant's claims. (*Id.* at 65, 73.)  The ALJ disagreed, finding "sufficient evidence from the relevant period to the date last insured to support a finding of severe impairments that are limiting." (*Id.* at 20.)  The state agency consultants did not complete RFC evaluations.

Dr. Lynn Rankin, the neurologist who administers Claimant's Botox injections wrote an opinion in October 2018. (*Id.* at 802-07.)  Dr. Rankin stated she had been treating Claimant for "many years," that Claimant had chronic migraines, and that his

11

prognosis was "good." (*Id.* at 802.) The form Dr. Rankin completed was written in the present tense and did not instruct Dr. Rankin to concentrate on the time period from 2002 to 2007. (*Id.* at 802-07.) Dr. Rankin did not complete the sections of the form related to functional limitations, stating, "We don't evaluate this," "We don't do functional capacity tests," and "We don't evaluate." (*Id.* at 803-06.) Dr. Rankin opined that Claimant would likely be absent from work more than four days-per-month as a result of his migraines. (*Id.* at 807.) Dr. Rankin also stated that Claimant experiences photophobia, phonophobia, nausea, and slow cognition during migraines. (*Id.*) The ALJ found the statements in Dr. Rankin's opinion unpersuasive because they were made more than ten years after Claimant's LDI, they did not relate back to Claimant's LDI, Dr. Rankin did not provide answers for many questions in the form relating to functionality, and "there is nothing in the treatment notes from the relevant period to support that the claimant would be missing work that much." (*Id.* at 20.)

## 2. *Claimant's Arguments*

Claimant argues that the ALJ did not address the appropriate listing for medical equivalence for migraines at step three of the sequential evaluation process. (Doc. 11 at 4.) Claimant next asserts that the ALJ's conclusion that a lack of documentation that Claimant's migraines were not disabling prior to Claimant's LDI does not explain the RFC limitation of "avoiding concentrated exposure to work hazards," an RFC limitation Claimant assumes is related to migraines. (*Id.* at 6.) Claimant argues that although the ALJ relied on his daily activities and CT scan, the limitation does not "precisely describe [his] headache-related limitations during the relevant period" and asserts that noise and light limitations should have been included in in the RFC. (*Id.* at 7-8.)

Claimant also takes issue with the ALJ's "reject[tion] of Dr. Rankin's opinion." (*Id.*) Claimant concedes that an opinion written ten years after a claimant's LDI would normally be a good reason for questioning an opinion, but that the ALJ's conclusion that

there was nothing in the treatment notes from the relevant time period to support that Claimant would miss work more than four days of work-per-month, calls that rationale into question. (*Id.*) Claimant cites specific pages of the record that he claims support the conclusion that he was unemployable due to migraines. (*Id.* (citing AR 289, 284-85, 346).) Thus, according to Claimant, Dr. Rankin's and other VA treatment notes are supportive of Dr. Rankin's opinion that Claimant would miss more than four days of work per month, had Dr. Rankin's opinion related to the relevant time period. (*Id.*)

Therefore, Claimant argues that the ALJ should have contacted Dr. Rankin for clarification regarding the time period covered by her opinion. (*Id.* at 8.) Claimant argues that "[t]here is reason to believe Dr. Rankin's post-dated opinion could also apply to the relevant time period. . . ." (*Id.*) Claimant asserts this was especially important in this case because the ALJ did not rely on other opinion evidence when crafting the RFC. (*Id.* (citation omitted).)

I will first address Claimant's step four argument because resolution of that issue will shorten discussion of the step three issue.

### 3. *Analysis*

#### a. *Claimant's Step Four Argument*

A "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press [his] case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806. However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the

13

record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir.1988)). The ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (alterations in original)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). "In the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Hensley*, 829 F.3d at 932 (alteration in original) (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Although Claimant bears the burden to "provid[e] the evidence [the ALJ] will use to make a finding about [Claimant's] residual functional capacity," the ALJ is "responsible for developing the claimant's complete medical history." 20 C.F.R. § 404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper

evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p.

Claimant's argument that "[t]here is reason to believe Dr. Rankin's post-dated opinion *could* also apply to the relevant time period" does not justify remand. (Doc. 11 at 8 (emphasis added).) For two reasons, it is obvious that Dr. Rankin's opinion applies to Claimant's condition in 2018 when it was written. First, the instructions for the form Dr. Rankin completed state, "Please answer the following questions concerning your patient's impairments." (AR at 802.) There is no mention of the relevant time period and questions are written in the present and future tense. (*Id.* at 802-07.) It was Claimant's burden to prove he was disabled. *Moore*, 572 F.3d at 523.

Second, and more importantly, it is obvious that the opinion does not relate to the relevant time period because in 2007 Dr. Rankin stated that Claimant "never has any nausea or vomiting with his headaches." (*Id.* at 289.) Dr. Rankin also never mentioned slow cognition, confusion, or any similar symptom in 2007. (*Id.*) None of Defendant's doctors documented nausea or slow cognition during migraines during the relevant time

period.[4]  In her 2018 opinion, Dr. Rankin listed "nausea [and] slow cognition during severe migraine" as limitations caused by Claimant's migraines.  (*Id.* at 807.)  Therefore, it appears these side effects manifested after Claimant's LDI.  Thus, Dr. Rankin's opinion relates to Claimant's condition in 2018.  *See Luckenbach v. Barnhart*, 36 F. App'x 872, 873 (8th Cir. 2002) (unpublished) (ALJ correct not to base RFC on physician's statements that did not relate to claimant's disability status during the relevant period).

Furthermore, even if Dr. Rankin's opinion applied to the relevant time period, it would not change the ALJ's opinion.  Claimant's claim was filed on or after March 27, 2017.  Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c and 416.920c apply to an analysis of Dr. Rankin's opinion.  Under these rules, no medical opinion is automatically given controlling weight.  20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability,  (2) consistency,  (3) provider's relationship with the claimant, (4) specialization,  and  (5) other  factors.  *Id.*  §§  404.1520c(c),  416.920c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

### i. Supportability

Although Dr. Rankin had treated Claimant for eleven years in her area of expertise by the time she wrote her opinion, she cited no treatment notes explaining her conclusions.  (AR at 402-07.)  And, as discussed above, her treatment notes do not support her opinions, except that she noted Claimant had no "photophobia or phonophobia except with the severe attacks; in which case, he has some phonophobia."

---

[4] During the relevant time period, Claimant received all of his medical treatment at the VA.

(*Id.* at 289.) She did note that Claimant stated he needed to rest because of headaches one day a week, but that does not necessarily equate to missing more than four days of work per month because the notes do not say how long Claimant needs to rest. They certainly do not say that Claimant has to rest the entire day. Moreover, Claimant would not necessarily need to rest on a workday, if this situation was consistent throughout the relevant time period, which it was not. The first time Claimant mentioned weekly headaches was in September 2007, three months before his LDI. The chain of weekly headaches was broken the next month after Claimant's first Botox injections when Claimant had ten days' relief and an entire week with no headaches at all. (AR at 284.) Thus, this single statement is insufficient to establish disability given the relief Claimant received after only one Botox treatment. Thus, even if the opinion applied to the relevant time period, this factor would not weigh in favor of giving the opinion weight. The issue then becomes whether Dr. Rankin's opinion is consistent with the evidence in the record as a whole, which is the focus of Claimant's remaining arguments. (Doc. 11 at 7.)

      *ii.*     **Consistency**

"The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2). Claimant cites the following pages to support his argument that Dr. Rankin's opinion that Claimant would miss more than four days of work per month is supported by the record as a whole: AR 284-85, 289, 346.

The final treatment notes during the relevant time period are Dr. Rankin's notes from November 2007, one month after Claimant's first Botox injections, where Claimant told Dr. Rankin he experienced good relief from Botox for ten days, having no headaches for an entire week, but that after that, he was having three to six headaches per week.

(AR at 284.) Claimant was taking Compazine and naproxen for his mild headaches and was taking hydrocodone for severe headaches. (*Id.*) Claimant was able to stay within his "two day per week" limit on hydrocodone. (*Id.*) Claimant was getting some exercise by hunting. (*Id.*) Dr. Rankin's impression was that after one Botox treatment, Claimant's migraines were "unchanged to slightly improved." (*Id.* at 285.)

The ALJ acknowledged this treatment note:

> The treatment notes document ongoing migraines with relative control throughout the period with the conservative use of medications but some worsening towards the end of the period with the claimant's treatment increasing to include Botox injections. . . . His work history indicates that he had worked numerous years at substantial gainful activity levels with those impairments. The treatment notes at the time of the alleged onset date indicated he had lost his jobs for other reasons that were not solely related to his severe impairments.

(*Id.* at 20.) Claimant's RFC is what he can still do despite his limitations. *Guilliams*, 393 F.3d at 801. As will be discussed in more detail below, the ALJ's assessment of the record as a whole supported the RFC.

Claimant also cites an April 3, 2006 treatment note written by Dr. Debra Benjamin, Claimant's former neurologist, that states Claimant "remains unemployable secondary to his posttraumatic stress disorder and his intractable headaches." (AR at 346.) This sentence, however, is an outlier among the neurologists' treatment notes because there does not seem to be a treatment note to tie the "remain" to. Claimant does not cite any other treatment notes stating that he was unable to work due to his headaches. *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)). More importantly, the rest of the same treatment note is at odds with this sentence. It states that Claimant was

doing well with headache control and did not want to change medications. (*Id.* at 346.) The treatment note explained that "[e]verything that he is using right now is keeping his pain under relatively good control." (*Id.*) Claimant also had a "better outlook on his life situation" because he was dating a new woman, which was "much easier on his headaches." (*Id.*) Thus, the sentence about Claimant's inability to work seems misplaced. To the extent this sentence is an "opinion," it is inconsistent with Dr. Benjamin's contemporaneous treatment notes and therefore not persuasive.[5] *See Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (ALJ entitled to give less weight to physician's opinion that is inconsistent with physician's own findings).

Claimant's last citation is to Dr. Rankin's treatment note that states that Claimant's "headaches during this time were associated with photophobia and phonophobia and worsened as the day went on. (TR 289)." (Doc. 11 at 7.) First, Claimant misreads part of this treatment note. As discussed above, Dr. Rankin stated that Claimant

> does *not* have photophobia or phonophobia except with the severe attacks; in which case, he has some phonophobia. . . . He started taking hydrocodone in about 2003 and states that it works [sic] very well at first. He would take it at bedtime and wake up without a headache, but it would generally return later in the day. The headaches worsened as the day goes on.

(AR at 289 (emphasis added).) Thus, Dr. Rankin did not state that Claimant suffered from photophobia. Moreover, there are only two treatment notes from the relevant time period documenting photophobia: one from 2005 stating that Claimant was "rather photophobic" and the November 2007-post Botox treatment note, written one month before Claimant's LDI, stating that Claimant was photophobic when he saw Dr. Rankin. (*Id.* at 284, 370.) Thus, the record as a whole does not support including this limitation

---

[5] Claimant also fails to explain how this sentence supports his argument that Dr. Rankin's opinion should be interpreted to apply to the relevant time period.

in the RFC. Likewise, the only mention of Claimant being phonophobic is the September 2007 treatment note. (*Id.* at 289.) Thus, this limitation is not supported by substantial evidence in the record as a whole. Second, the ALJ acknowledged Claimant's history of migraines during the relevant time period. The chronology at the beginning of this Report and Recommendation largely follows the chronology of Claimant's migraine treatment in the ALJ's decision. (*Id.* at 15-16.) The ALJ also acknowledged Claimant's use of medications and "variable control of headaches." (*Id.*) Therefore, to the extent Claimant asserts that this treatment note contained limitations that should have been included in the RFC, the record does not support his argument.

The ALJ found that Claimant's extensive and varied daily activities undermined his claims of disabling conditions and were "supportive of a range of light work activity with reduced contact with others." (*Id.* at 18-19.)

> [C]laimant reported the ability to attend to his own personal cares, cooked meals for himself and four children, cared for his four children including one who had special needs, shopped for groceries late at night, exercised, spent time with his dogs, worked on vehicles and did house repairs, gardened and did preserves, attended school functions and went hunting.

(*Id.* at 18.) That Claimant was able to maintain this full slate of activities indicates that his headaches were reasonably well-controlled during the relevant time period. In addition, as the ALJ noted, Claimant was able to work "at Tyson Foods for many years with [migraines.]"[6] (*Id.* at 15.) Thus, evidence in the record does not support a finding that Claimant's migraines were as limiting as Claimant asserts. *See Goff v. Barnhart*, 421 F.3d 785, 792–93 (8th Cir. 2005) (when claimant worked with impairments for over

---

[6] Claimant testified that he was terminated from Tyson due to his migraines. (AR at 42.) However Claimant told his doctor he was terminated because he injured his hand at work, "was written up, counseled, and in essence, forced to leave." (*Id.* at 478.) *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (quitting work for reasons other than disability relevant to credibility determination).

three years and there was no evidence of significant deterioration in her condition, impairments were not disabling) (citing *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992)); *Guilliams*, 393 F.3d at 801 (RFC is what claimant can still do despite his limitations). Moreover, the ALJ noted that Claimant searched for work during the relevant time period. (AR at 17.) Claimant also accepted unemployment benefits during this time. (*Id.* at 468.) To collect benefits, Claimant had to confirm for the State that he was "able to work, [] available for work and [] earnestly and actively seeking work." Iowa Code § 96.4(3). Applying for unemployment benefits "may be some evidence, though not conclusive," to negate a claim of disability. *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991). Moreover, Claimant's "search for a new job after [his] layoff further evinces both a willingness and ability to work after [he] allegedly became disabled." *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015). Thus, the fact that Claimant applied for jobs after he allegedly became disabled calls into question the intensity and limiting effects of his migraine.

Furthermore, Claimant's VA compensation and pension examinations were focused solely on Claimant's ability to obtain gainful employment. Psychologist Michael McNeil, who made the decisions, concluded that Claimant's migraines would not prevent him from being employable during the relevant time period. (AR at 321-24, 333, 402-07, 416.) Even when Dr. McNeil concluded that Claimant's PTSD would make it difficult for Claimant to find work, he did not say that Claimant's migraines would do so. (*Id.* at 283.) Thus, while the ALJ did not find Dr. McNeil's most recent opinion persuasive, the opinion focused on PTSD, not migraines:

> The claimant had several C&P examinations for his impairments and neither PTSD nor headaches were found to prevent employability. (Ex. IF, pp. 86-90, 99). However, at his last C&P examination before the expiration of the date last insured, despite admitting to significant activities of daily living and it being noted that the claimant had previously been denied

unemployability, the examiner indicated the claimant would have difficulties obtaining and maintain[ing] employment. (Ex. 1 F, pp. 45-49).

. . .

The undersigned has considered the statements of the VA C&P examiner of [sic] Michael McNeil, Ph.D. (Ex. IF, p. 49). Dr. McNeil is an acceptable medical source. After examining the claimant, Dr. McNeil stated that there was no specific increase in PTSD symptoms but went on to indicate that due to PTSD, the claimant would show reduced reliability and productivity, have more difficulty than the average person in getting and holding employment due to poor relationship skills, extreme aversion to being or working around others and somewhat inappropriate presentation. (Ex. IF, p. 49). The undersigned finds those statements unpersuasive in comparison to the longitudinal record from the alleged onset date to the date last insured showing fairly good control of both migraine and PTSD symptoms in relation to the claimant's strong activities of daily living discussed above. (Ex. IF).

(*Id.* 18, 19.)   Thus, although the ALJ did not find Dr. McNeil's final assessment that Claimant would have difficulty finding work persuasive, that assessment was based on Claimant's PTSD, not migraines.   Dr. McNeil provided evidence in the record of Claimant's ability to work with migraines during the relevant time period and did not state that migraines were related to any work difficulties.  (*Id.* at 321-24, 333.) This, in addition to the evidence cited above, supports the ALJ's decision on this issue.

After reviewing the entire record, I agree with the ALJ that while Claimant's migraines certainly were not eliminated during the relevant time period and they worsened near the end of the period, the evidence on the record as a whole, including years of treatment notes documenting Claimant's migraines and other headaches, including periods of relief and extended times when Claimant only experienced minor headaches; Claimant's activities of daily living; and the VA compensation and pension

examinations[7] is inconsistent with Claimant's claim of disabling migraines. (AR at 20.) *Guilliams*, 393 F.3d at 801 ("[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole.") (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir. 1995)). Moreover, as explained above, the record as a whole does not support inclusion of a noise or light limitation in Claimant's RFC. The record was not ambiguous or inadequate to allow for proper evaluation of Claimant's complaint. *Coleman*, 2013 WL 4069523, at *2. Therefore, remand is not required for further development.

---

[7] I realize the ALJ did not find the VA compensation and pension examinations conclusions persuasive. By mentioning them in this Report and Recommendation, I am not reweighing the evidence. *See Vester*, 416 F.3d at 889. However, the ALJ cited the early examinations when discussing evidence that supported his conclusion that Claimant's migraines were not disabling:

> At the hearing, the claimant testified that migraines had not been found to be a service connected disability due to a lack of documentation. It is that same lack of documentation that results in a finding that the migraines are not disabling prior to the date last insured. . . . The claimant had several C&P examinations for his impairments and neither PTSD nor headaches were found to prevent employability. (Ex. IF, pp. 86-90, 99). However, at his last C&P examination before the expiration of the date last insured, despite admitting to significant activities of daily living and it being noted that the claimant had previously been denied unemployability, the examiner indicated the claimant would have difficulties obtaining and maintain[ing] employment. (Ex. 1 F, pp. 45-49).

(AR at 18.)

Moreover, a fair reading seems to be that the ALJ found only the conclusion of the final examination unpersuasive because that examination is the one the ALJ quoted when reaching his conclusion. (*Id.* at 19.) As discussed above, in the final examination, Dr. McNeil based his decision regarding Claimant's employment difficulties on Claimant's PTSD, not his headaches. The Eighth Circuit instructs that under our deferential standard of review, the Court "must strive to harmonize statements where possible." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018).

Accordingly I recommend the District Court affirm the ALJ's decision on this issue. *See Kluesner*, 607 F.3d at 536 (if the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the Court] must affirm the [Commissioner's] denial of benefits."). This is true even if the Court would have reached the opposite conclusion. *See Hacker*, 459 F.3d at 936 (ALJ's decision not outside that zone of choice simply because the court might have reached a different decision).

### b. *Claimant's Step Three Argument*

Claimant's argument that the ALJ failed to analyze whether his migraines were medically equal to Listing 11.02 is underdeveloped. The entire argument is reproduced below:

> The ALJ did not address the appropriate Listing for medical equivalence for migraines at Step Three of the sequential evaluation process. (TR 13-14); *See* Social Security Ruling 19-4p: Titles II and XVI: Evaluating Cases Involving Primary Headache Disorders ("Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder.").

(Doc. 11 at 4.) This passage contains no legal analysis or argument incorporating law and facts. *See Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)) (collecting cases for proposition that undeveloped arguments are waived). Moreover, "[a]n ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (citation omitted); *see also e.g.*, *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) ("Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion. . . .") (citation omitted).

24

Although Claimant's argument is underdeveloped, I will address it because it appears the Eighth Circuit instructs the courts to do so. *See Vance,* 860 F.3d at 1118 (addressing argument that was almost as underdeveloped as the argument at bar, but that at least noted what section of the Listing applied: "In her argument about Listing 11.00, Vance asserts only that she meets Listing 11.17A."). The Commissioner only argues that Claimant has waived the issue because his argument was underdeveloped. (Doc. 12 at 6.)

This Court addressed this issue in *Hall v. Comm'r of Soc. Sec.*, No. 18-CV-2032-LTS-KEM, 2019 WL 7666529 (N.D. Iowa Aug. 16, 2019), *R. & R. adopted sub nom. Hall v. Saul*, 2019 WL 5085427 (N.D. Iowa Oct. 10, 2019).

> Listing 11.02 provides for listing-level severity based on the type of seizure, the frequency with which they occur, and, if less frequent, a marked limitation in one of the following categories: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02. This Listing went into effect on September 29, 2016. Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048, 43048, 43051 & n.6 (July 1, 2016). Prior to that time, there were two Listings for seizures: Listing 11.02, which governed convulsive seizures "occurring more frequently than once a month in spite of 3 months of prescribed treatment"; and Listing 11.03, which governed nonconvulsive seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.02, 11.03 (2016).

*Id.* at *5. Like Claimant, the claimant in *Hall* also filed her claim for benefits prior to 2016. *Id.* at *1 (claimant filed for benefits on August 24, 2014 alleging disability beginning on May 27, 2013). However, the version of the listing in effect at the time the ALJ rendered his decision governs the case. *See Burkhardt v. Berryhill*, No. 16-CV-2093-LTS, 2017 WL 9470631, at **6-7 (N.D. Iowa Apr. 3, 2017) (applying version of

listing in effect at time of ALJ's decision), *R. & R. adopted*, 2017 WL 2829624 (N.D. Iowa June 30, 2017).

*Hall* discussed *Mann v. Colvin*, 100 F. Supp. 3d 710 (N.D. Iowa 2015), in which this Court discussed medical equivalence to the then-in-effect Listing 11.03. 2019 WL 766529, at *5. *Mann* noted that the SSA's *Programs Operations Manual* ("*POMS*") provided an example of when a migraine would equal Listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

*Id.* (citing *Mann,* 100 F. Supp. 3d at 719.) Chief Magistrate Judge Mahoney opined that although it appeared that this *POMS* guidance was no longer in effect, it did not mean it was an incorrect statement of the law. *Id.* Judge Mahoney found that in spite of the claimant's long record of headaches and trials on medications, substantial evidence in the record as a whole supported the ALJ's conclusion that the claimant's migraines improved with medication. *Id.* at *6-*7. Any error the ALJ committed by failing to explicitly consider and analyze Listing 11.02 was harmless given the ALJ's findings and discussion of her RFC. *Id.* at *7.

Chief Judge Strand affirmed the decision and clarified that under Listing 11.02, the listing could be met under the following circumstances:

[I]f severe migraines "occur[ ] at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." *Id.* § 11.02(B) (citation omitted).

The listing may also be met if severe migraines occur[ ] at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following:

    1. Physical functioning; or

    2. Understanding, remembering, or applying information; or

    3. Interacting with others; or

    4. Concentrating, persisting, or maintaining pace; or

    5. Adapting or managing oneself.

*Id.* § 11.02(D).

*Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *9 (N.D. Iowa Oct. 10, 2019) (line break added). Judge Strand found the record contained "abundant evidence" that the claimant suffered from migraines and headaches, trial and error with medications, and that at times that the claimant's symptoms even were possibly severe enough to meet Listing 11.02. *Id.* In spite of this, *Hall* reasoned that

> Although there is some evidence that Hall's migraines could be equivalent to Listing 11.02, I do not reweigh the evidence but review only to determine whether there is substantial evidence to support the ALJ's conclusions. *See Baldwin,* 349 F.3d at 555. In this case, there is substantial evidence that Hall's migraines have improved with treatment and lifestyle changes to the extent that Hall has not suffered sufficiently severe and frequent migraines for at least three months despite treatment so as to equal Listing 11.02. Although for much of the relevant time frame no single treatment permanently worked for Hall, multiple types of treatment resulted in at least temporary improvement. Many times when Hall reported returning or worsening headaches and migraines, some other health problem was usually reported or was a likely cause of them.

*Id.* (citations to the record omitted).

Like the Claimant in *Hall*, Claimant experiences migraines, but nothing in the record states that severe migraines occur as frequently as needed to meet Listing 11.02(B). Claimant never sought treatment specifically for his migraines—he apparently

waited until his scheduled follow-up appointments with neurology and mental health professionals to discuss his concerns. Although "for much of the time frame no single treatment permanently worked, multiple types of treatment resulted in at least temporary improvement." *Id.* There is no documented weekly onset of migraine lasting three months. *Id.* Sometimes there are vague references in treatment notes to "the past few "days" or even "weeks," but those references were generally followed by treatment notes documenting improvement. (*Compare* AR 478 *with* 466; 444 *with* 432 & 419; 353 *with* 345-46; 325 *with* 315.) A September 2007 treatment note mentions weekly headaches requiring rest, but does not state how long this had been occurring. (*Id.* at 289.) As discussed above, that cycle was broken the next month when Claimant had ten days' relief from Botox, including an entire week without any headaches. (*Id.* at 284.) Thus, Claimant does not meet Listing 11.02(B).

Moreover, although Claimant takes prescription medications and sometimes had to lie down because of migraines, during the relevant time period, he never had aura, nausea, or alteration of awareness. Furthermore, as discussed above, Claimant had no trouble performing activities of daily living, doing more than the mere basics—he hunted; tended a garden; exercised; spent time with his dogs; worked on vehicles; did house repairs; attended school functions; took care of his children, including one with special needs; and canned preserves. (AR at 18 (citing 279-83).) In addition, as discussed above, Claimant found relief during the relevant time period from various medications. Thus, assuming the Listing 11.03 equivalency *POMS* guidance is still relevant, Claimant does not meet the equivalency under the old Listing 11.03 criteria. *See Hall*, 2019 WL 766529, at *5.

To the extent Claimant now wants to rely on Listing 11.02(D), for the same reasons just discussed, Claimant also has not met his burden to prove he has severe migraines every two weeks. In addition, as discussed above, Claimant did not have

physical limitations related to his migraines. Rather, he engaged in a rather robust variety of both indoor and outdoor activities. Dr. McNeil tied Claimant's limits in interacting with others and managing himself (his "inappropriate presentation") to his PTSD, not his migraines. (*Id.* at 19.) Treatment notes do not state that Claimant had difficulties understanding, remembering, or applying information or concentrating, persisting, or maintaining pace during the relevant time period.[8] Claimant worked with migraines (*Id.* at 15) and looked for work during the relevant time period. (*Id.* at 460, 468.) Moreover, like the claimant in *Hall*, whose migraines worsened with health issues, Claimant's migraines worsened with situational stress, which cannot be the basis of a disability. (AR at 325, 346, 477.) *See Dunahoo v. Apfel,* 241 F.3d 1033, 1039-1040 (8th Cir. 2001).

Thus, even though there is evidence that might arguably support a finding that Claimant meets Listing 11.02, Claimant does not direct the Court to it. *See Singer*, 897 F.3d at 980. I recommend the District Court find any error the ALJ committed by failing to explicitly consider and analyze Listing 11.02 was harmless given the ALJ's findings and discussion of Claimant's RFC. *See Moore*, 572 F.3d at 522 (the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

**B.      *Whether the ALJ was Appointed in a Constitutional Manner***

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. 2044, 2049 (2018). Claimant argues that SSA ALJs should be treated

---

[8] Dr. Rankin listed "slow cognition during migraine," as a limitation. (AR at 807.) Thus, it is safe to assume that Claimant would have directed the Court to citations in the record that would have supported a finding that Claimant experienced this limitation during the relevant time period. I have not found any such references during my independent review of the record.

as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 11 at 9-13.) Claimant asserts this Court should vacate the denial of benefits by ALJ Hogan and remand the case for decision by what he contends is a properly-appointed ALJ. (*Id.* at 13.)

Claimant asserts his Appointments Clause challenge for the first time in his brief to this Court. (Doc. 12 at 9-13.) During pendency of this case, the Eighth Circuit determined that Social Security disability claimants waive appellate review of Appointments Clause challenges if they fail to raise the issue during agency proceedings. *See Davis v. Saul*, 963 F.3d 790, 795 (8th Cir. 2020), *cert. granted*, No. 20-105, 2020 WL 6551772 (U.S. Nov. 9, 2020). Accordingly, Claimant's request to vacate the ALJ'S decision so his case can be heard by a properly-appointed ALJ should be denied.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ.

**To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and

Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 23rd day of February, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa